# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

## 25-60269

---

## UNITED STATES OF AMERICA
### Plaintiff-Appellant

### vs.

## LEXUS SANCHEZ WEAVER
### Defendant-Appellee

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

### 1:24-CR-110-1

---

## BRIEF OF APPELLANT

---

**CLAY JOYNER**
**United States Attorney**
**Northern District of Mississippi**
**900 Jefferson Avenue**
**Oxford, MS 38655-3608**

**PHILIP M. LEVY**
**Assistant United States Attorney**
**Northern District of Mississippi**
**900 Jefferson Avenue**
**Oxford, MS 38655-3608**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the government is unaware of any persons who might have an interest in the outcome of this case other than:

1.  Hon. Michael P. Mills, Senior Judge, NDMS, Oxford, MS;

2.  Clay Joyner, United States Attorney, NDMS;

3.  Philip M. Levy, AUSA, NDMS;

4.  Lexus Sanchez Weaver, Defendant-Appellee;

5.  Merrill Nordstrom, Assistant Federal Defender, NDMS, Attorney for Defendant;

These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

*s/ Philip M. Levy*
Philip M. Levy
Assistant United States Attorney
Attorney for Plaintiff-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

The government requests oral argument. The district court entered a memorandum opinion and order suppressing evidence that is essential to the prosecution of serious drug distribution and firearm offenses. The suppression order relied on an erroneous interpretation of applicable legal precedent. The government respectfully submits that oral argument may assist the Court in evaluating the facts and law at issue in this appeal.

# CONTENTS

**CERTIFICATE OF INTERESTED PERSONS**      **i**

**STATEMENT REGARDING ORAL ARGUMENT**      **ii**

**CONTENTS**      **iii**

**TABLE OF AUTHORITIES**      **iv**

**STATEMENT OF JURISDICTION**      **1**

**STATEMENT OF THE ISSUES**      **2**

**STATEMENT OF THE CASE**      **3**

**SUMMARY OF THE ARGUMENT**      **167**

**ARGUMENT**      **19**

**CONCLUSION**      **32**

**CERTIFICATE OF SERVICE**      **33**

**CERTIFICATE OF COMPLIANCE**      **34**

# TABLE OF AUTHORITIES

## CASES

*Andreen v. Lanier*, 573 F. Supp. 2d 1, 4 (D.D.C. 2008)...........................................21

*Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010)...................................................28

*D.C. v. Wesby*, 583 U.S. 48, 62 (2018) ....................................................................20

*Illinois v. Gates*, 462 U.S. 213, 235 (1983) .............................................................23

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) ............................................... 27, 28, 30

*North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979)..........................................28

*Soffar v. Cockrell*, 300 F.3d 588, 592 (5th Cir. 2002)..............................................28

*Spencer v. Staton*, 489 F.3d 658, 661–662 (5th Cir. 2007) .....................................22

*United States v. Alix*, 86 F.3d 429, 435 (5th Cir. 1996)...........................................24

*United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994)...............................28

*United States v. Barrington,* 806 F.2d 529, 532 (5th Cir. 1986) ...................... 13, 24

*United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005) ...............................27

*United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019)................................20

*United States v. Cisneros*, 112 F.3d 1272 (5th Cir. 1997).......................................24

*United States v. Devaney*, 109 F.4th 322, 326 (5th Cir. 2024).................................22

*United States v. Fields*, 182 F. Supp. 2d 575 (E.D. Tex. 2002) ...............................24

*United States v. Foy*, 28 F.3d 464, 474 (5th Cir. 1994)...........................................25

*United States v. Huerra*, 884 F.3d 511, 516 (5th Cir. 2018) ................................ 24

*United States v. Jennings*, No. 23-60516, 2024 WL 1927934, at *1
(5th Cir. May 2, 2024) ...................................................................................27

*United States v. Kelly*, 140 F.3d 596, 603 (5th Cir. 1998)......................................26

*United States v. Leon*, 468 U.S. 897 (1984) ...........................................................19

*United States v. Marmolejo*, 89 F.3d 1185, 1198 (5th Cir. 1996) ...........................19

*United States v. Moore*, 999 F.3d 993, 997 (6th Cir. 2021) ....................................21

*United States v. Morton*, 46 F.4th 331, 338 (5th Cir. 2022)........... 19, 20, 21, 22, 26

*United States v. Norman*, 129 F.4th 874, 877 (5th Cir. 2025)................................23

*United States v. Payne*, 341 F.3d 393 (5th Cir. 2003)......................... 18, 19, 20, 21

*United States v. Roundtree*, 299 F. App'x 905, 907 (11th Cir. 2008)....................21

## STATUTES

18 U.S.C. § 3731 .......................................................................................................1

## <u>STATEMENT OF JURISDICTION</u>

The District Court entered its Memorandum Opinion granting the Defendant's Motion to Suppress on April 22. The United States filed its Notice of Appeal on May 14, 2025, within 30 days from the entry of the Opinion and Order. 18 U.S.C. § 3731.

The Memorandum Opinion and accompanying Order are appealable because the District Court suppressed physical evidence that is essential to all five charges in the indictment. The evidence is "substantial proof of a fact material in the proceeding." *Id.*

## <u>STATEMENT OF THE ISSUES</u>

I.     Whether the District Court Erred When Suppressing Evidence Discovered Pursuant to a Search Warrant at Weaver's Residence.

II.    Whether the District Court Erred When Suppressing Statements Made by Weaver During a Custodial Interview on the Grounds that Weaver's Waiver of his Miranda Rights Was Uninformed and Therefore Invalid.

## **STATEMENT OF THE CASE**

After drugs and firearms were found at Lexus Sanchez Weaver's residence, a federal grand jury in the Northern District of Mississippi returned a five-count Indictment against him for Drug Trafficking (Counts One through Three), Possession of a Firearm in Furtherance of a Drug Trafficking Crime (Count Four), and Felon in Possession of a Firearm (Count Five). ROA.7-8. All five charges stem from drugs and firearms that were recovered from his residence on March 8, 2025, during the execution of a search warrant. ROA.166-67.

Following indictment, Weaver filed a Motion to Suppress both the evidence found during the search and incriminating statements he gave to law enforcement following the search. ROA.167. The Court held an evidentiary hearing on the Motion to Suppress and granted it in full, addressing the following categories of evidence that make up the grounds for this appeal: (1) the physical evidence that was seized from Weaver's residence pursuant to a warrant-authorized search; and (2) the statements that Weaver made to law enforcement during a post-arrest custodial interview. ROA.123-34, 153.

### **A. The Evidence**

#### **1. The Search**

Weaver lives in a residence near downtown Starkville, Mississippi. ROA.162. Weaver came onto Starkville Police Department's radar after a

3

Confidential Informant (CI) was able to set up a confidential drug buy with him. ROA.159.

Law enforcement bought crack cocaine from Weaver at his residence three separate times during a three-week time frame between February and March 2024. ROA.161. Each buy was conducted in the same manner. ROA.159-61. Law enforcement used the CI to set up and conduct the buy. ROA.159. On each occasion, the CI was checked for drugs and money before the buy (to make sure he was not setting up Weaver). ROA.160. During the buy, the CI was monitored by law enforcement until he delivered the drugs to law enforcement. ROA.160, 165-66. At the end of the buy, the CI was checked for money and drugs (to make sure he did not steal any money or drugs from law enforcement). ROA.160, 166. This controlled buy procedure was typical. ROA.160.

On March 7, 2024, following the last buy, Starkville Police Officer and FBI Task Force Officer (Officer) Garrett P. Mittan applied for a search warrant with Starkville Municipal Court Judge Brian Kelly to search Weaver's residence for crack cocaine and other controlled substances. ROA.161. The affidavit in support of the search warrant explained to Judge Kelly that law enforcement had bought crack cocaine from Weaver at his residence on the three previous dates (the affidavit omitted the precise drug amount and provided a date range to protect the CI's identity), and set out some, but not all, of the details about how each

4

controlled buy was conducted. ROA.179. The probable cause paragraph of the

affidavit stated:

> This investigation was initiated after information was obtained from a reliable confidential informant, herein after referred to as "CI". The CI is reliable in that I have previously received information from this informant that has been found factual and accurate. The CI is assisting law enforcement with criminal investigations in return for case consideration for pending criminal charge(s). CI is familiar with the appearance of controlled substances, the way they are sold, transported, and used in that the CI has sold, transported, and used controlled substances in the past.
>
> Between the dates of 2/5/2024 and 2/19/2024, CI at the direction and surveillance of myself and other law enforcement personnel purchased an undisclosed amount of crack cocaine from Lexus Weaver at xxx Greensboro Street xxx xx. Prior to and after each purchase, CI was searched for money and contraband with none being found. CI was under continuous surveillance by law enforcement prior to each purchase, during each purchase, and after each purchase until CI was again searched for money and contraband with none being found. During the buy Weaver informed the CI that his neighbor had to cook the product before the CI could get the product. Weaver goes into apartment E tells the individual inside the apartment to give "it" to CI when individual was done. Weaver refers to the individual as Mike. Weaver leaves and later returns in a Ford Expedition registered to Michael Barnett with the address of 301 Greensboro Street apartment E.
>
> Between the dates of 2/20/2024 and 2/28/2024, CI at the direction and surveillance of myself and other law enforcement personnel purchased an undisclosed amount of crack cocaine from Lexus Weaver at xxx Greensboro Street xxx xx. Prior to and after each purchase, CI was searched for money and contraband with none being found. CI was under continuous surveillance by law enforcement prior to each purchase, during each purchase, and after each purchase until CI was again searched for money and contraband with none being found.
>
> Between the dates of 2/29/2024 and 3/07/2024, CI at the direction and surveillance of myself and other law enforcement personnel purchased an undisclosed amount of crack cocaine from Lexus Weaver at xxx Greensboro Street xxx x. Prior to and after each purchase, CI was searched for money and contraband with none being found. CI was under continuous surveillance by law enforcement prior to each purchase, during each purchase, and after each purchase until CI was again searched for money and contraband with none being found.

ROA.89.

Judge Kelly reviewed the search warrant and affidavit and arranged for a

FaceTime (videoconferencing) call with Officer Mittan. ROA.194. Judge Kelly

spoke with Officer Mittan over FaceTime and approved the search warrant.

ROA.163-65, 194-95. At Judge Kelly's direction, Officer Mittan signed Judge

Kelly's name to the search warrant and signed his own name beside the notation

"via facetime" to show how the search warrant had been approved. ROA.164-65.

Law enforcement executed the search warrant on March 8, 2024, and found

methamphetamine, cocaine, and firearms in Weaver's residence. ROA.67-68, 166-

67. Weaver was arrested and taken to the Starkville Police Department, where he

was questioned. ROA.167.

### 2. The Statements

The questioning was recorded on video and audio. ROA.167. The video

recording showed the following:

Officer Mittan and Detective Milam entered the interview room at 1:40 pm.

Officer Mittan immediately began the interview by stating, "All right Lex" and

then introduced himself and the other detective, Detective Milam. ROA.217, Gov.

Ex. 4.[1]

Officer Mittan then stated, "We just want to talk to you about what

happened today, and to get some info from you" and proceeded to ask Weaver

about his contact information. ROA.217, Gov. Ex. 4.

After getting this information, Officer Mittan stated, "All right man, I know

it's been a long day for you, I should just kind of get right to it, bro, we need to talk

---

[1] The video recording was Government's Exhibit 4 to the suppression hearing. The following transcription is the Government's best attempt to transcribe the conversation and describe the events depicted in the video recording.

to you about what happened today, you know, and why cops showed up at your house . . . . But before I do that I gotta get you your constitutional protections, if you would, go over here with me . . ." ROA.217, Gov. Ex. 4.

As he began advising Weaver of his Miranda rights, Officer Mittan showed Weaver the Miranda form and proceeded to read him the following rights while pointing to them with a pen on the sheet of paper in front of Weaver:

> You have the right to remain silent.
>
> Anything you say can and will be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

ROA.95. As Officer Mittan read Weaver his rights, Weaver held his head in his hands and did not look up. ROA.217, Gov. Ex. 4.

When Officer Mittan finished reading Weaver his rights, Officer Mittan stated, "Do you understand that?" ROA.217, Gov. Ex. 4.

Weaver responded in the affirmative, "Mm-hmm." Officer Mittan gave Weaver the pen and stated, "All right, if you'll just sign right there, that's just saying that I read that to you." ROA.217, Gov. Ex. 4.

Weaver did not appear to read the form but signed it where Officer Mittan instructed, and Officer Mittan started the interview with "All right Lex, well, we got some interesting stories . . ." as Weaver is signing the form. ROA.217, Gov. Ex. 4.

The Miranda form had the following language below the individual rights listed above under the heading "Waiver of Rights": ROA.95.

"I (have read) or (had read to me) this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." ROA.95.

Officer Mittan did not read the "Waiver of Rights" paragraph to Weaver and did not use the word "waiver" as he explained to Weaver his Miranda rights. ROA.168.

Weaver talked with the law enforcement officers for about one hour, discussing his involvement in drug trafficking. ROA.217, Gov. Ex. 4. The conversation was noncombative, and Weaver appeared to be comfortable talking with law enforcement. ROA.217, Gov. Ex. 4. No one raised his voice or appeared upset or agitated. ROA.217, Gov. Ex. 4.

8

### B. The Motion to Suppress

### 1. Suppression Arguments

### a. The Search

Weaver filed a Motion to Suppress challenging the constitutionality of the search and his statements. ROA.33. With respect to the search, Weaver argued the search was unconstitutional because Judge Kelly approved the search warrant in violation of Mississippi law, which, according to Weaver, did not permit Judge Kelly to approve the search warrant via FaceTime. ROA.36-37. Weaver also briefly argued that the search warrant affidavit did not establish probable cause because the affidavit stated that the CI was searched after the purchase and "no contraband was found." ROA.39.

The government argued that probable cause was clear in the affidavit because Officer Mittan stated three times that "the CI at the direction and surveillance of myself and other law enforcement personnel purchased an undisclosed amount of crack cocaine from Lexus Weaver at [his residence]." ROA.56. The government explained that Officer Mittan meant that the CI was searched after completing the buy to make sure the CI did not take any contraband with him. ROA.56.

The government devoted most of its attention to Weaver's argument that the search warrant was invalid because Judge Kelly failed to follow Mississippi law.

ROA.56-57. The government argued that Judge Kelly's procedure was correct under Mississippi law, but regardless, the good faith exception would clearly apply because Officer Mittan followed Judge Kelly's instruction. ROA.56-57, 69.

### b. The Statements

With respect to his statements, Weaver challenged the constitutionality of the statements, claiming that Officer Mittan misrepresented to Weaver what he was signing. ROA.39-41. He argued that Officer Mittan should have read the entire "Waiver of Rights" paragraph to Weaver before asking him to sign the Miranda form. ROA.39-41.

The government responded that the video recording clearly showed that Officer Mittan read Weaver his rights and that Weaver acknowledged he understood his rights. ROA.58-59. The government argued that Weaver voluntarily gave statements to law enforcement, and the "Waiver of Rights" paragraph, regardless of whether it should have been read to Weaver, had no impact on his decision to talk ROA.59. The interview was non-combative; neither Weaver nor the interviewers became loud or upset. ROA.59. There was nothing coercive about the interview. ROA.59.

### 2. Suppression Hearing

### a. The Search

Officer Mittan and Judge Kelly testified at the suppression hearing. ROA.158, 185. Officer Mittan explained how CI drug buys work, and how and why he searches CIs for drugs before and after controlled buys. ROA.159-61. Officer Mittan testified that he, through the CI, bought drugs from Weaver three times. ROA.161. He also testified that this fact was clear from the affidavit because he stated in the affidavit that he purchased drugs from Weaver; however, on cross examination he agreed with defense counsel that failure to put "I found drugs on the CI post the buy" was an "oversight." ROA.166.

Judge Kelly testified that he approved the search warrant for Weaver's residence because he believed it was supported by probable cause. ROA.194. He told Officer Mittan to sign the search warrant for him, which was his common practice with law enforcement following the COVID-19 pandemic, and followed that instruction with a text message to Officer Mittan that the search warrants were approved.[2] ROA.70, 163-65, 194-96.

By following this procedure, Judge Kelly was following the post-COVID Emergency Administrative Orders issued by the Mississippi Supreme Court

---

[2] There were two search warrants approved by Judge Kelly. ROA.195. The other search warrant has no bearing on Weaver's case. ROA.195.

11

regarding the approval of search warrants. ROA.69, 188-92. Judge Kelly

conducted the search warrant procedure in this manner in order to comply with the

guidance of the Mississippi Supreme Court. ROA.192.

### b.  The Statements

As for the confession, Officer Mittan believed that Weaver understood his

Miranda rights and wanted to talk to him based on his interactions with Weaver.

ROA.168-69. It was Officer Mittan's understanding that "once you are advised of

your rights, you have the choice to continue talking or not talking." ROA.182-83.

On cross-examination, Officer Mittan agreed that he did not use the word "waiver"

or read the "Waiver of Rights" paragraph of the Miranda form to Weaver before

asking him to sign the form. ROA.168. Officer Mittan acknowledged that his

failure to read the waiver paragraph could be seen as "being deceivable," but he

testified that he was not trying to deceive Weaver. ROA.183-84. Nevertheless,

when asked about his specific conduct, Officer Mittan emphasized that he was

trying to ensure that Weaver understood his rights, that he believed Weaver

understood his rights, and that he believed Weaver did not want to exercise his

rights because he talked and did not ask for a lawyer. ROA.184.

At the end of the suppression hearing, the district court allowed the parties to

supplement their briefing. ROA.215. The government supplemented its briefing to

emphasize that the good faith exception to the exclusionary rule should apply to

the evidence seized during the search. ROA.111. It also reemphasized that the fact that Officer Mittan asked Weaver to sign the Miranda form had no impact on the validity of the waiver. ROA.113. It took the position that the video recording showed that Weaver voluntarily waived his Miranda rights because he understood his rights and chose to speak with law enforcement. ROA.116.

### C. The District Court's Opinion and Order

The district court entered a Memorandum Opinion on April 22, 2025 suppressing both the evidence found during the execution of the search warrant and Weaver's statements to Officer Mittan. ROA.184.

### 1. The Search

The district court began by considering the application of the good-faith exception to the exclusionary rule. ROA.128. The court expressed concern that the exception could "excuse an officer's attempt, or lack thereof, to establish sufficient probable cause when that officer himself drafted the affidavit in support of the search warrant and then relied 'in good faith' on such warrant." ROA.128. As an example, the court cited *United States v. Barrington*, a case in which the Fifth Circuit found the behavior of an officer who "obtained the warrant based on his own bare bones affidavit and then conducted the search himself" not to "fall within the ambit of the good faith exception." 806 F.2d 529, 532 (5th Cir. 1986). The district court declared that "[t]hat is precisely what occurred in the instant

13

case"—meaning that Officer Mittan himself drafted a bare bones affidavit and then

relied on it. ROA.129.

The court seemed to believe that Officer Mittan's affidavit was bare bones

for three reasons. First, the affidavit's description of the controlled buys "did not

specify the amount of crack cocaine purchased, nor did [it] indicate that the

substances were authenticated through any form of drug testing." ROA.129.

Second, the affidavit stated that the "CI was searched for money and contraband

with none being found." ROA.125. Third, the affidavit did not bear the "indicia of

probable cause" that this Court has recognized can "prevent" an affidavit that is

wholly "supported by a confidential informant" from being bare bones. ROA.126.

The district court thus concluded that "Officer Mittan's reliance on the invalid

search warrant cannot be excused."  ROA.131.[3]

The court also took issue with the fact that Judge Kelley approved the search

warrant via FaceTime. ROA.130-31. It acknowledged that the Mississippi

Supreme Court had issued an emergency administrative order during COVID

authorizing judges to issue search warrants via videoconference, but emphasized

that "the COVID emergency had long receded at the time the warrant was signed,"

---

[3] To be sure, the court also said that it "accept[ed] Officer Mittan's excusable neglect" for "the confusion surrounding his sworn statements" in light of his testimony that it "was an oversight on his part," so it is unclear what role the "none being found" language played in the court's analysis.  ROA.129.

14

and Judge Kelley was "the only state court judge" who still "conduct[ed] search warrant hearings via FaceTime." ROA.130-31. Although the court did not make clear what role this issue played in its decision, it appeared to bolster the court's decision that the search warrant was invalid. ROA.131.

The court concluded by noting that although it did "not wish to highlight the shortcomings of Officer Mittan or Judge Kelley," "it is imperative that the State be reminded of the inherent constitutional rights afforded to every defendant and the necessary practices and protocols protecting these rights." ROA.131. Because the court could not "in good faith" permit "the admission of evidence seized pursuant to an invalid search warrant," it suppressed the physical evidence.  ROA.131.

## 2.  The Statements

The district court also ordered that the statements made by Weaver during the custodial interview be suppressed. ROA.133. The court acknowledged that "Officer Mittan informed Mr. Weaver of his Miranda rights" and "advised Mr. Weaver that his signature [on the waiver form] confirmed those rights had been read to him." ROA.132-33. The court emphasized, however, that Officer Mittan did not inform Weaver that his "signature also operated as a waiver of those rights," which the court deemed "deceptive."  ROA.133. Because Officer Mittan did not "inform Mr. Weaver that his signature constituted more than a mere acknowledgement of the reading of his Fifth Amendment rights" or "of the legal

15

implications of waiving his rights," the court concluded that Weaver's waiver

"cannot be deemed voluntary or intelligent" and therefore was invalid. ROA.133.

# SUMMARY OF THE ARGUMENT

The district court erred in suppressing the physical evidence discovered pursuant to a search warrant at Weaver's residence. The district incorrectly found that the affidavit in support of the search warrant was bare bones, and therefore that the good faith exception to the warrant requirement did not apply.

The affidavit was not bare bones. The affidavit stated that Officer Mittan, using a CI, purchased crack cocaine from Weaver at his residence on three occasions. This information was enough that Judge Kelly could—and did—find probable cause to search Weaver's residence for drugs.

Nevertheless, this Court does not need to determine whether the affidavit established probable cause if it determines that the good faith exception to the warrant requirement applies. At minimum, the three buys detailed in the affidavit were sufficient for Judge Kelly to have a reasonable basis for issuing the search warrant, and Officer Mittan's reliance on Judge Kelly's approval was objectively reasonable. The good faith exception to the exclusionary rule should apply, and the physical evidence found pursuant to the warrant's execution should not be suppressed.

The district court also erred in suppressing Weaver's statements to Officer Mittan. Officer Mittan read Weaver his Miranda rights. Weaver acknowledged that he understood them and chose to provide statements to law enforcement officers.

17

Officer Mittan's failure to read the entire Miranda form had no bearing at all on Weaver's decision to waive his rights. The video shows both that Weaver understood and voluntarily waived his rights and that the Miranda form had no bearing on that decision. The Court should rely on the evidence of the video recording and find that Weaver's Mirada rights were not violated.

The government respectful submits that the district court erred in both of its suppression rulings, and both the physical evidence recovered from Weaver's residence and the statements provided to law enforcement officers should be admissible at trial.

# ARGUMENT

## I.  Whether the District Court Erred When Suppressing Evidence Discovered Pursuant to a Search Warrant at Weaver's Residence.

### A. Standard of Review

When a challenged search was conducted pursuant to a warrant, this Court determines "(1) whether the good-faith exception to the exclusionary rule applies; and (2) whether probable cause supported the warrant." *United States v. Marmolejo*, 89 F.3d 1185, 1198 (5th Cir. 1996). If the good-faith exception announced in *United States v. Leon*, 468 U.S. 897 (1984), applies, then the Court will generally "not reach the question of probable cause for the warrant." *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003); *see also United States v. Morton*, 46 F.4th 331, 338 (5th Cir. 2022) (en banc) (bypassing probable-cause question after determining that officers relied in good faith on a search warrant).

Under the good-faith exception, "evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith." *Payne*, 341 F.3d at 399. The objective reasonableness requirement applies to both the issuing judge's probable-cause determination and the "technical sufficiency" of the warrant. *Id.*

19

One of the circumstances where an officer's reliance on a warrant is objectively unreasonable is where the affidavit used to secure the warrant is "bare bones," i.e., "the warrant is based on an affidavit so lacking in probable cause as to render belief in its existence unreasonable." *Morton*, 46 F.4th at 336. For purposes of the good-faith exception, this Court reviews the district court's evaluation of the officer's objective reasonableness de novo. *Payne*, 341 F.3d at 399.

## B. The Good Faith Exception to the Exclusionary Rule Should Apply Because the Affidavit Was Not Bare Bones

The Supreme Court has cautioned trial courts not to take an overly-hypertechnical, line-by-line approach to determining probable cause, as a "factor viewed in isolation is often more 'readily susceptible to an innocent explanation' than one viewed as part of a totality." *See United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (quoting *D.C. v. Wesby*, 583 U.S. 48, 62 (2018)). This "divide and conquer" approach limits the field of view and fails to account for the "whole picture." *See Wesby*, 583 U.S. at 62. The Court should look to the whole affidavit in order to determine probable cause. *Id.*

The government asserts that the affidavit, particularly taken as a whole, sufficiently established probable cause to search Weaver's residence. Here, the affidavit clearly established that Officer Mittan conducted three controlled buys with Weaver. For each buy, Officer Mittan monitored the CI as the CI bought the

narcotics from Weaver at his residence. Officer Mittan explicitly stated in the affidavit that the CI was "under surveillance" when the CI purchased the crack cocaine. ROA.89. Officer Mittan's repeated use of the phrase "purchased . . . crack cocaine" leaves no ambiguity. ROA.89. A single controlled buy described in the manner of the affidavit would have been enough to establish *probable cause*. *United States v. Moore*, 999 F.3d 993, 997 (6th Cir. 2021) ("[A] confidential informant's credibility can be corroborated with a controlled buy  . . . Indeed, even a single controlled purchase can be sufficient to establish probable cause to believe that evidence of drug trafficking is present at the purchase location."); *United States v. Roundtree*, 299 F. App'x 905, 907 (11th Cir. 2008) ("It is clear that a properly executed controlled buy . . . is sufficient, standing alone, to establish probable cause."); *Andreen v. Lanier*, 573 F. Supp. 2d 1, 4 (D.D.C. 2008). In other words, Officer Mittan's affidavit read as whole—regardless whether it could have been clearer—was sufficient to establish probable cause.

 Nevertheless, the government takes the position on appeal that this Court need not reach the issue of probable cause because *Leon's* good faith exception to the exclusionary rule applies. *See Payne*, 341 F.3d at 399.

In a relatively recent en banc decision, this Court emphasized that "'[b]are bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable

21

cause." *Morton*, 46 F.4th at 336 (citation omitted). Such "affidavits do not detail any facts, they allege only conclusions." *Id.* at 337; *see also United States v. Devaney*, 109 F.4th 322, 326 (5th Cir. 2024) (explaining that "an affidavit is not bare bones merely because it fails to establish probable cause").

To start, as even the district court acknowledged, the affidavit detailed specific facts: It stated that the CI "purchased an undisclosed amount of crack cocaine from Lexus Weaver" at the address to be searched on three separate occasions, with each buy conducted "at the direction and surveillance" of Officer Mittan.  ROA.89. That is far afield from the kind of affidavits that the Supreme Court and this Court have found to be bare bones. *See Morton*, 46 F.4th at 337-38 (providing examples of bare bones affidavits and explaining that they "do not detail any facts" but "allege only conclusions"); *Spencer v. Staton*, 489 F.3d 658, 661-62 (5th Cir. 2007) (describing a "textbook example" of a bare bones affidavit, which "recit[ed] [defendant]'s biographical and contact information" and then stated "nothing more than the charged offense, accompanied by a conclusory statement" that the defendant committed the crime).

In addition, none of the district court's three reasons for finding the affidavit to be bare bones survives scrutiny.

First, the district court reasoned that the affidavit did not "specify the amount of crack cocaine purchased" or "indicate that the substances were

authenticated through any form of drug testing." ROA.129. But the district court did not cite, and the government cannot find, any support for the proposition that an affidavit is bare bones simply because it omits such details. Probable cause requires "only the probability, and not a prima facie showing, of criminal activity." *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (citation omitted). Common sense dictates that if a CI is attempting to purchase crack cocaine, the seller sells the CI a substance that looks like crack cocaine, and the CI returns with a substance that looks like crack cocaine, then there is probable cause to believe that the substance is actually crack cocaine. *See United States v. Norman*, 129 F.4th 874, 877 (5th Cir. 2025) (stating that a state judge may "draw reasonable, common-sense inferences from the affidavit").

Second, the district court described it as "[t]elling" that "the affiant's statements indicated that the 'CI was searched for money and contraband with none being found.'" ROA.129. Insofar as the district court thought those statements undermined the details in the rest of the affidavit, it was reasonable for Judge Kelley to interpret this statement as it was intended—as a description of the controlled buy procedure, rather than a contradiction of the immediately preceding statement that the CI purchased crack cocaine. That is especially true given that Officer Mittan testified that this language was intended to convey that the CI was searched so that the CI would not leave with any contraband—something that is

typical of controlled buys. ROA.159-61. This plausible reading of this sentence is wholly consistent with Officer Mittan's statements that the CI bought crack cocaine from Weaver on three different occasions. ROA.89.

Third, the district court reasoned that the affidavit was bare bones because it lacked certain "indicia of probable cause." ROA.126-27, 129-30. But, the body of case law on which the district court relied applies only when the officer has relied solely on the basis of the CI's tip to obtain a search warrant and thus the reliability of the CI is obviously in question. *See United States v. Huerra*, 884 F.3d 511, 516 (5th Cir. 2018); *United States v. Cisneros*, 112 F.3d 1272 (5th Cir. 1997); *United States v. Alix*, 86 F.3d 429, 435 (5th Cir. 1996); *United States v. Barrington*, 806 F.2d 529 (5th Cir. 1986);[4] *United States v. Fields*, 182 F. Supp. 2d 575 (E.D. Tex. 2002). It does not appear to have much, if any, relevance in the context of a CI buy where the officer has firsthand knowledge of what the CI is doing and is monitoring the CI in real time.

By relying on this body of precedent, the district court's opinion seems to incorrectly suggest that Officer Mittan relied exclusively on information provided

---

[4] The case that the district court specifically relied upon, *United States v. Barrington*, 806 F.2d 529 (5th Cir. 1986), bears no resemblance to the facts of this case. This is all the *Barrington* Court said about the affidavit at issue in that case: "The affidavit stated only that [the law enforcement officer] 'received information from a confidential informant' who is 'known to [the law enforcement] and has provided information in the past that has led to arrest and convictions.'" *Id.* at 531. This statement is far different from the three probable cause paragraphs contained in Officer Mittan's affidavit.

by others (the CI) and was personally ignorant of the precise circumstances of the buy. That conclusion is incorrect based on the information contained in the affidavit. Again, the affidavit states three times that "the CI at the direction *and surveillance of myself* and other law enforcement personnel purchased . . . crack cocaine . . . from Lexus Weaver at [his residence]." ROA.89 (emphasis added). Indeed, here, the controlled buys were themselves corroboration of the initial information received from the CI. *See United States v. Foy*, 28 F.3d 464, 474 (5th Cir. 1994) (stating in the context of applying the good faith exception that a CI tip corroborated by a controlled buy was sufficient for a reasonable officer to find probable cause).

Finally, to the extent the district judge's opinion turned on the warrant review-and-approval procedure and not the content of the affidavit, the government asserts that the good-faith exception should apply to any alleged procedural deficiency. Even if it is debatable whether Judge Kelley's procedure for approving the search warrant complied with Mississippi law,[5] "[t]he exclusionary rule is not

---

[5] Initially, the government understood that Weaver's challenge to the search warrant relied on his interpretation of *White v. State*, 842 So.2d 565, 569-70 (Miss. 2003). In *White*, the Mississippi Supreme Court previously held that telephonic search warrants are invalid under state law. *White*, 842 So. 2d at 569-70. But in response to the COVID-19 pandemic, the Mississippi Supreme Court entered an emergency order in August 2020 stating that "videoconferencing is a permissible means for law enforcement to obtain arrest and search warrants." ROA.189. The Mississippi Supreme Court appeared to rescind this guidance in May 2021, but then once again encouraged the use of videoconferencing in August 2021. ROA.191. As Judge Kelley explained in a letter that was filed with the district court, he believed that he

aimed at 'punish[ing] the errors of judges and magistrates' who issue warrants." *Morton*, 46 F.4th at 336 (quoting *Leon*, 468 U.S. at 916). By following the procedure for obtaining the warrant as directed by Judge Kelley, Officer Mittan acted reasonably, and the good-faith exception should apply. *See United States v. Kelly*, 140 F.3d 596, 603 (5th Cir. 1998) ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested.") (citation omitted).

Here, the affidavit stated that the CI "purchased an undisclosed amount of crack cocaine from Lexus Weaver" at the address to be searched on three separate occasions, with each buy conducted "at the direction and surveillance" of Officer Mittan. ROA.89. Judge Kelly reviewed the affidavit, found probable cause to search Weaver's residence, and directed Officer Mittan to sign the search warrant. ROA.164, 193-94. Officer Mittan relied on Judge Kelly and thereafter executed the search warrant, finding narcotics and firearms in Weaver's home. ROA.66-67, 166-67. The Court should find that the good-faith exception to the exclusionary rule applies in this circumstance and allow the government to present the narcotics and firearms as evidence at trial.

---

was acting in accordance with the Mississippi Supreme Court's guidance when he continued to use videoconferencing as a means of issuing search warrants in 2024. ROA.69, 192.

## II. Whether the District Court Erred When Suppressing Statements Made by Weaver During a Custodial Interview on the Grounds That Weaver's Waiver of His Miranda Rights Was Uninformed and Therefore Invalid.

### A. Standard of Review

"The district court's determination regarding the voluntariness of a defendant's confession and the validity of his waiver of his Miranda rights are questions of law that are reviewed de novo." *United States v. Jennings*, No. 23-60516, 2024 WL 1927934, at *1 (5th Cir. May 2, 2024). Whether the defendant waives his right "is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation." *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005).

### B. Weaver Waived His Miranda Rights by Acknowledging That He Understood Them and Voluntarily Talking with Law Enforcement

A Miranda waiver has "two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, the waiver must be voluntary, that is, "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, the waiver must be knowing, that is, "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

"There is no talismanic incantation of phrases required to satisfy the strictures of *Miranda*." *Cardenas*, 410 F.3d at 292. "[A]n explicit statement of waiver is not invariably necessary to support a finding that the defendant waived" his Miranda rights. *North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979). Normally, the knowledge element of Miranda is satisfied when a defendant is given his customary Miranda warnings. *Id.* (citing *United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994)). "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010); *see also Soffar v. Cockrell*, 300 F.3d 588, 592 (5th Cir. 2002) ("Despite receiving multiple Miranda warnings, Soffar continued to talk to the police, waiving his right to remain silent and his right to have an attorney present.). The presence or absence of coercive behavior is a "crucial aspect" to determining voluntariness. *Id.*

This Court's precedent clearly establishes effectively what Officer Mittan stated at the evidentiary hearing: that "once you are advised of your rights, you have the choice to continue talking or not talking." ROA.182-83.; *cf. Moran v. Burbine*, 475 U.S. 412, 422 (1986) ("Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his

statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."). It is undisputed that Officer Mittan read Weaver his rights; here, *absent coercion*, the fact that Officer Mittan read Weaver his rights and gave him the choice to exercise them is precisely what is required by law.

Weaver argued, and the district court agreed, that Officer Mittan's failure to read the entire form—his "inaction[]"—was deceptive. [6] But Officer Mittan's failure to read the "Waiver of Rights" paragraph was irrelevant. To be clear, the government has not and does not rely on the signed waiver form as evidence that Weaver waived his rights. A signed waiver form is not required, and the video recording provides all the evidence that this Court needs to evaluate what Weaver was informed of, what he understood, and whether he voluntarily waived his rights. As the video recording demonstrates, the waiver form did not influence Weaver's decision to talk. Weaver was accurately informed of his *Miranda* rights orally, and he chose to waive those rights by engaging in a consensual, hour-long conversation with law enforcement.

The district court did not say precisely whether it found Weaver's waiver was "unknowing" or "involuntary," that is, the district court did not specifically

---

[6] The government does not concede that Officer Mittan was being deceptive—he testified that he was not; however, the government's position is that what Officer Mittan was accused of being deceitful about did not influence Weaver and should not matter in determining whether Weaver's waiver was knowing or voluntary.

identify which dimension of Miranda was constitutionally insufficient. *Moran*, 475 U.S. at 421. Reading the court's opinion carefully, however, the court focused on Weaver's knowledge, not his voluntariness to talk. ROA.133. Specifically, the Court determined that Weaver did not waive his rights because "he was never informed of the legal implications of waiving his rights and thus could not have made an informed decision." ROA.133. In fact, the district court's statement that Officer Mittan's actions (or inactions) were deceptive was directly tied to the Court's belief that "Mr. Weaver's signature also operated as a waiver of those rights—something Weaver was not *informed* of." ROA.133 (emphasis added). The Court's focus was solely on what Officer Mittan was required to tell Weaver, i.e., inform him of.

The Court acknowledged that Officer Mittan read Weaver his Miranda rights. ROA.132. That fact is undisputed. Therefore, the Court implicitly held that reading a defendant his Miranda rights is not enough to inform a defendant of those rights. In this case, the district court appeared to require Officer Mittan to use the magic words, "waiver," and explain to Weaver the "legal implications" of waiving his Miranda rights. ROA.133.

Weaver has not directly stated that he was deceived into talking because he signed the form. This assertion is of course belied by the video itself. Regardless, turning to the voluntariness of Weaver's statements, the video recording speaks for

itself. The factual recitation above does not adequately reflect the consensual nature of the interview. The video recording shows that Officer Mittan, consistent with his testimony, wanted Weaver to understand his rights and was not at all attempting to coerce, trick, or deceive Weaver into waiving them. ROA.184. Again, the district court did not hold that Officer Mittan coerced, tricked, or deceived Weaver into involuntarily waiving his rights, but even if it did, the Court can evaluate the voluntariness of the wavier de novo on appeal.

Further, the district court's assertions that Weaver was not informed of the "legal implications" of his rights overlooked the content of the Miranda warning itself: You have the right to remain silent. Anything you say can and will be used against you in court." ROA.95. This first warning both explained to Weaver his right, and it did precisely what the district court faulted Officer Mittan for not doing—it explained the legal implications of not asserting this right: *Anything you say can and will be used against you in court*. The legal implication he was informed of—that his statement could be used against him—was the same legal implication he hoped to avoid by filing his Motion to Suppress.

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully requests that the Court reverse the district court's ruling on the Motion to Dismiss and find that the evidence seized pursuant to search warrant and the subsequent statements given during the custodial interview should not be suppressed.

Respectfully submitted,

CLAY JOYNER
United States Attorney
MS Bar No. 10316


By: *s/Philip M. Levy*
   Philip M. Levy, MS Bar 103900
   Assistant United States Attorney
   Northern District of Mississippi
   900 Jefferson Avenue
   Oxford, MS 38655-3608
   Telephone:  662.234.3351
   Criminal Division Fax: 662.234.0657

## <u>CERTIFICATE OF SERVICE</u>

I, Philip M. Levy, Assistant United States Attorney for the Northern District of Mississippi, hereby certify that I electronically filed the foregoing Brief of Appellant with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Merrill Nordstrom

[merrill_nordstrom@fd.org](mailto:merrill_nordstrom@fd.org)

and I hereby certify that I have mailed via United States Postal Service the document to the following non-ECF participants:

None.

This the 21st day of July, 2025.

*s/Philip M. Levy*
Philip M. Levy
Assistant United States Attorney

## **CERTIFICATE OF COMPLIANCE**

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th Cir. R. 32.2.7(b).

EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5th Cir. R. 32.2.7(b)(3), THE BRIEF CONTAINS (select one):

A. **6,427** words, OR

B. _____ lines of text in monospaced typeface.

THE BRIEF HAS BEEN PREPARED (select one):

A. in proportionately spaced typeface using:

Software Name and Version: **Microsoft Word 2016** _____

in (Typeface Name and Font Size): **Times New Roman 14cpi**

B. in monospaced (nonproportionally spaced) typeface using:

Typeface name and number of characters per inch: _____

THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESEN-TATION IN COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN 5th Cir. R. 32.2.7, MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.


*s/Philip M. Levy* _____
Philip M. Levy
Assistant United States Attorney